# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 18-97


**STATE OF LOUISIANA**

**VERSUS**

**CHARLES P. MAYEUX, JR.**

**AKA CHARLES P. MAYEUX**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 188,015-B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## D. KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**APPELLATE COUNSEL FOR DEFENDANT/APPELLANT:**
**Charles P. Mayeux, Jr.**

**Anthony F. Salario**
**First Assistant District Attorney**
**439 North Main Street**
**P.O. Box 503**
**Marksville, LA 71351**
**(318) 240-7123**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Michael Francis Kelly**
**First Assistant District Attorney**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-5815**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Hon. Charles A. Riddle, III**
**District Attorney, 12th JDC**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**SAVOIE, Judge.**

Defendant, Charles Mayeux, appeals his conviction of second degree murder and sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of March 21, 2015, Defendant, who was the Chief of Police and the Assistant Fire Chief of Evergreen, Louisiana, called 911 to report a fire at his residence in Evergreen. The body of Defendant's wife, Shelly, was later found in the bedroom of the residence. They had been married for about ten months at the time of Shelly's death. After an investigation, Defendant was subsequently arrested. On July 16, 2015, he was charged by grand jury indictment with one count of second degree murder of his wife, which is a violation of La.R.S. 14:30.1. A jury trial was held August 28, 2017, through September 1, 2017.

Evidence introduced at trial indicated that Defendant was the only person present with Shelly in their residence at the time of her death. Although an autopsy was performed, the cause of Shelly's death was undetermined. All experts agreed, however, that Shelly died before the fire. The cause of the fire was also undetermined; however, the fire marshal concluded that the fire was intentionally set to cover up a homicide. His conclusion resulted from the suspicious timing of Shelly's death with the onset of the fire; the Defendant's lack of effort to try to rescue Shelly despite his training as a firefighter and despite the proximity of both the fire station and Defendant's firefighting gear; a history of violence between Defendant and Shelly; a history of abusive behavior by Defendant toward his ex-wife and ex-girlfriend; and Defendant's inconsistent statements as to the events leading up to the fire.

Following trial, Defendant was found guilty of second degree murder by a 10-2 jury verdict. He filed a Motion for New Trial on September 12, 2017, which was denied by the trial court. On September 12, 2017, the trial court sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

Defendant filed a notice of appeal on September 12, 2017, which was granted that same date. On appeal, Defendant states the following as assignments of error:

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Charles Mayeux committed the second degree murder of Shelly Mayeux.

2. The trial court erred in allowing evidence of other alleged other crimes/bad acts to be admitted at trial when no exception to the hearsay rule applied and/or the probative value of the evidence was far outweighed by the prejudicial effect the evidence would have on Charles Mayeux.

3. Counsel rendered assistance below that guaranteed by the Sixth Amendment and Charles Mayeux was prejudiced as a result of counsel's deficient performance when counsel failed to object to the admission into evidence of the investigative report prepared by Deputy State Fire Marshal Chase Hawthorne, which contained inadmissible hearsay and evidence.

4. The trial court erred in providing an incorrect and/or insufficient limiting instruction to the jury concerning evidence admitted at trial.

5. The trial court erred in accepting Deputy State Fire Marshal Chase Hawthorne as an expert in origin and cause and fire investigation.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

2

## ASSIGNMENT OF ERROR NUMBER 1

Defendant contends that the evidence was insufficient to find beyond a reasonable doubt that he committed the second degree murder of his wife, Shelly Mayeux.

**Standard of Review**

The following jurisprudence sets forth the standard of review in this case:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Thus, to affirm, the record must reflect that the State satisfied its burden of proving beyond a reasonable doubt all of the essential elements of second degree murder under the above standard. Louisiana Revised Statute 14:30.1(A)(1) defines, in pertinent part, second degree murder as "the killing of a human being . . . when the offender has specific intent to kill or to inflict great bodily harm[.]"

Because the instant case involves a conviction based upon circumstantial evidence, we are further mindful of the following in connection with our review:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d

3

1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ___ U.S. ___, 138 S.Ct. 392 (2017).

While Defendant herein also challenges the admissibility of certain evidence introduced at trial, we will consider all of the evidence introduced at trial for purposes of reviewing the record for sufficient evidence. *See State v. Hearold,* 603 So.2d 731, 734 (La.1992):

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal[.]. . . When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime . . . .

> On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial.

## Review of the Evidence

At the time of the incident, Defendant was the Chief of Police and the Assistant Fire Chief of Evergreen. Defendant testified at trial. He stated that on Friday, March 20, 2015, the day prior to the fire, his wife Shelly had woken up sick

and was vomiting. Therefore, he stayed home with her, rather than going to work. According to Defendant, Shelly told him that she might be having a miscarriage. However, there was evidence reflecting that Shelly had previously had a tubal ligation; but, Defendant denied knowledge of that. Defendant testified that Shelly would not stop vomiting and that they drove to the hospital that morning. However, he could not make Shelly go inside the hospital; therefore, they left the hospital and stopped to get gas in Bunkie.

Defendant further testified that on March 20, 2015, he had responded to a police call regarding horses that were loose on the highway. He indicated that a horse was behind his house, so he searched for it on foot; however, he was unable to find it.

He stated that when he returned home from the call, he and Shelly began making plans for picking up Shelly's children. He told Shelly he would go pick up his paycheck from work and then go pick up the children. He testified that after picking up his check, traffic caused him to run late; therefore, the stepmother of Shelly's two sons called him. Defendant indicated that after he had picked up the children, he brought them to Shelly's mother's house. He then stopped at Walmart to purchase medicine for Shelly, and then stopped at Family Dollar in Cottonport to purchase soup and crackers for Shelly. He testified that it was approximately 5:00 p.m. and still daylight when he returned home. He indicated that later that evening, Shelly had quit vomiting, they watched television, and then laid in bed together and had sexual intercourse.

According to Defendant, he then spoke to his dad about a new truck, and asked Shelly if she wanted to ride with him to his dad's house in Bunkie. While driving,

5

Defendant received a call from Mr. Rushing Juneau. Defendant testified that they never made it to his dad's house because Shelly had gotten nauseated again.

Defendant also indicated that, as a police officer, he had made "rounds" on March 20, 2015, prior to the fire. He explained that he typically made rounds at night, before going to bed, and, at trial, he described his route as follows:

> A. I leave my home, that's my home, I usually check the fire station, my sister use [sic] to live here and I use [sic] to make a round and I'll cross the bayou, I had the senior apartments here, I go through the parking lot, that's what's good about being a police officer in a small town, you know everybody, so if something's out of place, you recognize it, I check on my old people and I go down College, C.G. Lobin Construction is right here, I check that business, because it's attempted to be broken into before, I check all, I go down College, the Baptist church and cemetery is right her.
>
> . . . .
>
> A. I check this area, I come across, there some apartments in this area that I have trouble with sometimes with people that live there, so I always look that area [sic], the park is right here, I use [sic] to have a lot of problems with people hanging out drinking right here.
>
> . . . .
>
> A. I checked the park because I had trouble with people with loitering, drinking, and stuff like that, and there's a little, there was a little store right here, a little mom and pop store I call it, it closes at like 3:00 in the afternoon, I'll check the catholic church, the K.C. Hall, the rectory, the cemetery back here.
>
> Q. That's a different cemetery, so there [sic] two cemetery [sic]?
>
> A. I mean yeah, that's all we got in Evergreen, you know I'll go the Burn's road, my city limits end in this area just like here, here on the highways, I'll go a little bit further.
>
> Q. Why?
>
> A. Because the Sherriff's[sic] office is, their [sic] busy, they have a lot more traffic than I do, so sometimes I'll go a little bit further out if there's like about this area is a big tractor shed for a farm, so sometimes I'll just go out at night and I turn around there, just shine the spot light make sure no one's breaking in and I have to turn around anyway, I do it on the Burn's road, there's a potato plant right here, sometimes I shine

6

my light at the potato plant, I know the guy that owns it, I do it as a favor, I'll go back down Hills Street and we have the Sewer plant that's back here and believe it or not, people will break in to a sewer plant, there's tools, there's chemicals and I'll go . . .

Q.     Let me ask you, does your fire, is your fire district bigger than your city limits?

A.     It's a lot bigger than the city limits, my fire district goes almost to Goudeau, and around this COOP [sic], it's a lot bigger than the city limits.

Q.     We're talking about the rounds that you make every evening?

A.     It's a little gravel road, I'll check the sewer plant right here, my city limit on end [sic] here, I mean I don't care to turn around right at the city limits.

Q.     Do you have jurisdiction outside the city to make an arrest?

A.     Of course, yeah, if you're assisting the Sheriff's office or another town, yeah, you're a police officer.

Q.     How many miles from your house to where we are right now, roughly?

A.     May be a mile.

Defendant explained that the night of March 20, 2015, he had made rounds along the route he described, but he did not remember where he had turned around. He stated that when he returned home, it was dark, and he and Shelly wanted to rent a movie. He also went to the fire department to get a laptop computer.

Several other witnesses testified concerning communications they had with Defendant and Shelly on March 20, 2015, the day prior to the fire. Briana Rabalais, an employee of the Avoyelles Parish Sheriff's office and Shelly's co-worker, testified that Shelly had called in sick the morning of March 20, 2015, and sounded very upset at the time. Ms. Rabalais also indicated that she had called Shelly later in the day and that Shelly sounded irritated.

7

In addition, Brian Bordelon, the owner of a trucking company for which Defendant worked, testified that on March 20, 2015, Defendant sent him an email or text indicating that Shelly had miscarried the night before and that he would be staying home with her. Mr. Bordelon stated that typically Shelly would pick up Defendant's paycheck, but that on March 20, 2015, Defendant had picked it up and Shelly was not with him.

Laurie Bordelon, who was the stepmother of Shelly's two sons, testified that on March 20, 2015, Shelly was scheduled to pick up her sons from her between 4:00 p.m. and 4:15 p.m. When Shelly did not arrive as scheduled, she called Defendant's phone since Shelly did not have one, and Defendant answered telling her he was at the dentist for a broken tooth. Defendant, however, denied, making this statement to Ms. Bordelon. Ms. Bordelon also indicated that when Defendant finally arrived to pick up the boys, he was by himself, which was unusual, and that Defendant told her Shelly was sick.

Shelly was also scheduled to have visitation with her daughter the weekend of the fire. Sherie Lemoine, Shelly's daughter's stepmother, testified that on March 20, 2015, she received a message indicating that Shelly would pick up her daughter at 5:30 p.m. because they only had one vehicle. The daughter, however, wanted to stay with her stepmother because they were boiling crawfish, so she tried to call her mother on Defendant's phone. She talked to Defendant and indicated she might not go. Shelly's daughter called back later and told Defendant she did want to go to their house, and Defendant told her he was not sure if he would be able to pick her up by 7:30 p.m. Defendant ultimately did not show up at all, without notice. According to Ms. Lemoine, this was unusual, as Shelly would always let her know whether or not she was coming to pick up her daughter.

8

Defendant testified that on March 20, 2015, the night before the fire, he had fallen asleep on the couch watching a Will Farrell movie and Shelly had fallen asleep in the recliner. He indicated that in the early hours of March 21, 2015, he woke up to the fire, but did not "hear wood popping, wood splitting, like you do in a normal fire." At that point, he thought the house was "smoldering," so he got up, but did not see Shelly. He thought that maybe she "went to the bedroom or she ran out of the house", and he indicated that her blanket was still in the chair where she had fallen asleep. He testified that he then "got down" and crawled and tried to scream for Shelly, but that his "voice would cut out." Then he went outside. He stated that he did not see flames because of all the smoke, and that he did not have his "SCBA, which would be the face mask, the air pack," with him, as it was at the fire station. Defendant further explained that when he was exiting the house, he passed by the carport door and went towards the back door instead, but that he did not know why he did this.

Defendant testified that when he left the house, he was coughing, throwing up, and trying to catch his breath. He stated that, although he could not holler, he looked for Shelly. He further indicated that he saw flames rolling out of the bedroom window but saw no flames in the rest of house, and he called 911 three times.

Defendant testified he called 911 and then "went back in the house" to find Shelly. He indicated that he was able to make it "to the bar." When he went out of the house, he then heard ammunition "going off" inside, which he stated sounded like "hand grenades." He explained that he had boxes of rifle bullets and other shotgun shells in the house. He then stated that he tried to go back into the house for a third time but was not able to go very far and he then ran out of the house. He testified that something had hit him in the head, although it did not cause him any

injury, and he noted that ceiling tiles were falling. Defendant further explained that, at that point, he was "hysterical" and could not remember if he "crawled, ran, [or] skipped, the third time[.]"

Evidence of Defendant's calls to Avoyelles Parish 911 was submitted at trial. Defendant's first call was at 2:08 a.m. on March 21, 2015. Over the course of five minutes, Defendant called 911 three times. He told the 911 operator that his wife was in the residence, that he could not get her out, and that bullets were "going off" in the residence. During the calls, Defendant did not give his full name or address, and emphasized his concern for the safety of the firefighters. He explained he did not give his name or address because he thought the 911 operator recognized his voice.

Clint Armand, the Fire Chief of the Evergreen Fire Department, responded to Defendant's 911 calls, and he testified at trial. He explained that he and Defendant were close friends, Defendant had been his assistant at the Evergreen Fire Department for about seven years, and Defendant was trained as an EMT. Chief Armand further testified that, as a fireman, Defendant was issued "turnout gear," consisting of a coat, pants, hood, gloves, and a helmet. He also noted that on March 20, 2015, the day prior to the fire, Defendant did not stop by for his usual visit because, according to Defendant, "they were all sick or throwing up[.]"

According to Chief Armand, Defendant's residence was approximately 450 feet from the Evergreen Fire Department, Defendant had the code to access the fire station, and he knew how to operate the fire truck. He also testified that when he received Defendant's 911 call, the fire truck was at the station with the keys inside the truck.

After receiving the 911 call, Chief Armand drove the fire truck from the Evergreen Fire Department to Defendant's residence. He testified that when he arrived at the scene, he saw a fire on the left rear side of Defendant's residence. While he was handling the fire hose, he saw Defendant running in the opposite direction, back towards the carport of the residence. Defendant did not speak to him. Chief Armand indicated that he attempted to fight the fire from the outside of the house because, at the time, he was the only one who had arrived at the scene. He also testified that he was panicked and upset because he was friends with Defendant.

Joseph Frank , the Fire Chief of Bunkie, also testified at trial. He had received a page at 2:20 a.m. on March 21, 2015, concerning the fire at issue. At trial, Chief Frank was accepted without objection as an expert in the field of firefighting. He testified that he arrived on the scene about seven or eight minutes after receiving the page, and when he did, other men from his department were already there. He described the fire as a "small cage" fire, "meaning that the whole building was not engulfed in flames[.]"

Despite Defendant's warning that bullets were "going off" in the residence, Chief Frank's men entered the residence to extinguish the fire. Chief Frank, and others, testified that while it was necessary to be aware of the ammunition, the ammunition was not being used as a weapon, and therefore it would simply "pop" like a firecracker, causing the casing to burst. There was also evidence indicating that Defendant had previously pawned his service weapon, and only Defendant's duty belt with its "mags" was in the bedroom.

Chief Frank indicated that one of his men first extinguished the fire in the kitchen without turnout gear, and then, with full gear, his men extinguished the remaining fire. According to Chief Frank, the fire was under control in twenty-five

11

to thirty minutes. Chief Frank also indicated that Defendant never voiced any concern about getting his wife out of the residence, and Defendant never had to be restrained from going inside the residence.

Chase Hawthorne, a Deputy State Fire Marshall, also testified at trial. He was accepted as an expert in origin and cause of fire. He indicated that he arrived at the scene at approximately 3:15 a.m. or 3:20 a.m., at which time, the fire was under control.

Mr. Hawthorne testified that Shelly's body was found in the bedroom and that the bedroom was where the fire had originated. He noted that the fire was still burning when he arrived at the scene, the bedroom door was closed, the bed was still intact, and the mattress had not burned. Mr. Hawthorne also explained that Shelly's body was found face down, in a boxer's stance, which suggested to him that she had made no attempt to move away from the intense heat of the fire, which he explained had originated on the right side of Shelly's body. This observation lead Mr. Hawthorne to opine that Shelly had died before the fire. He further indicated that the couch on which Defendant alleged he was sleeping when the fire started was twelve to fourteen feet away from where Shelly's body was found. Mr. Hawthorne also noted that Defendant left a door to the residence open, which he suggested would allow the fire to receive more oxygen and grow faster.

Mr. Hawthorne also testified that while he was investigating the scene, Defendant appeared in the bedroom window. He asked Defendant to leave the crime scene and noted that Defendant became upset at the reference to a crime scene. Mr. Hawthorne asked Defendant to submit a statement, and he read Defendant's statement, which was written at 6:08 a.m. on March 21, 2015, into the record, stating as follows:

12

A.     "Friday morning I woke up with my wife she was sick and called in to work, we both went back to bed and got up again at 8, she took a bath we watched TV for a little while and she went back to bed. I took care of different chores around the house." I'm assuming that says like laundry. "At about 1:15 my wife got up again and went lay on the recliner she asked me if I would go get the kids and bring them to her mom's house because she was not feeling good. I picked up the boys at Wendy's at 4:30 and brought them to their grandmother, my mother-in-law I stayed for about 30 minutes. I went to Wal-Mart to pick up my meds and look for some nausea meds for Shelly. On my way home I stopped at the Dollar Store picked up some Sprite and soup for Shelly. I came back home, I talked to my dad on the phone, I put up the things from the store, and put some clothes in the dryer. Shelly was still sleeping I went to Bayou Express in Cottonport and got something to eat. I came back home and Shelly was up. I told her I got her some soup but she did not want to eat. We watched TV for a little while. I asked if she wanted to get out the house, she said yes. We left to go to my dad's but the ride was making her sick, we turned around at the old co-op across from DC-2 and came back home. We started to watch a movie around 9:35 and I fell asleep. I woke up after getting hot and coughing and when I woke up everything was black. I tried to get to the bedroom but could not get past the TV because it was too hot and bullets were going off. I went outside to see if she made it out. I called dispatch and went back in the house, I got about mid-way through the kitchen but could not go further. I went back outside after hearing more bullets going off. I fell in the grass, threw up, that's when I first . . . that's when the first fire truck pulled up."

Defendant gave another statement at the Avoyelles Parish Sheriff's Office at 11:50 a.m. on March 21, 2015, at which time he voluntarily turned over his clothing and cell phone and submitted to DNA testing. According to Hawthorne, at this time, Defendant showed no signs of injury, and his clothes did not smell of smoke. This was confirmed by the testimony of Michael Cammack, a detective with the Avoyelles Parish Sheriff's Office, who was present during the March 21st interview.

Mr. Hawthorne testified that Defendant added additional information to his story in connection with his second statement, including that Defendant had been watching a Will Farrell movie prior to the fire. Mr. Hawthorne indicated that the movie case was found at the scene, however, no DVD was found in the DVD player.

13

Mr. Hawthorne also testified Defendant had revealed to him that he and Shelly routinely fought and discussed divorce; but that, around the time of the fire, they had not fought because his wife was sick.

Similarly, Detective Cammack testified that Defendant admitted he and Shelly fought often, with Shelly often asking for divorce. Defendant, however, denied physically abusing Shelly. According to Detective Cammack, Defendant had also revealed that, while he had not physically abused any other women with whom he had previously had relationships, he had pinned one of the women against the wall.

Mr. Hawthorne and Detective Cammack also testified that, when the officers sought to collect Defendant's clothes during the interview, Defendant, without prompting, voluntarily stated that he and Shelly had sexual intercourse around 5:00 p.m. the night of the fire, despite Defendant's indication that Shelly was sick that day.

Detective Cammack further testified that Defendant explained he had tried to go into the residence to rescue Shelly several times, but the smoke and heat prevented him from doing so and that he did not think about using the police radio in his possession, despite his training. Detective Cammack further noted that one of the back doors to Defendant's residence had previously been kicked in because Defendant was angry about keys being left in the house, and that the door to Defendant's office as chief of police had also been kicked in. Defendant described himself to the detectives as a "hot head" and that he had a "firecracker temper."

Detective Cammack interviewed Defendant a second time in July 2015, and he testified as to several inconsistencies in Defendant's statements. For example, he noted that Defendant suggested during the first interview that his wife had been

vomiting the day of the fire; but during the second interview, he stated she had a miscarriage. Defendant also indicated to Cammack that his wife was bleeding badly, and he had convinced her to go to the Bunkie hospital; however, when they arrived at the hospital, they did not go in and went back home. Defendant also indicated that his wife was not bleeding when they had sex prior to the fire. Defendant further denied during the interview that his wife had previously had a tubal ligation, suggesting that he knew she had been hiding something from him.

Detective Cammack also testified concerning inconsistencies between Defendant's statements and his cell phone records. He reviewed the cell phone records with Detective Jeremiah Honea, who was an Avoyelles Parish detective accepted at trial as an expert in electronic data extraction. Defendant had told detectives that on March 20, 2015, the day prior to the fire, he and his wife had begun to drive to Defendant's father's house, but turned around near the Evergreen co-op because she was sick. Defendant explained that during the drive, he had spoken to Mr. Rushing Juneau on his cell phone between 9:00 a.m. and 9:30 a.m.

However, Defendant's cell phone records suggested that Defendant was not near the Evergreen co-op during this time. Rather, the three precision locations for Defendant's phone during the time of his call to Mr. Juneau was 1.75 miles away from Defendant's residence, in a rural and wooded area just outside of Evergreen, described as a "ditch, forest area."

Detective Cammack additionally testified as follows concerning the inconsistencies between Defendant's first and second interviews:

A.      He did in the second interview come back and state oh I went and made rounds. We also found that he had went to the fire department which he left out in the first interview, I'm sorry police department is right behind it. He went there gave his statement [sic] was he was going to get a computer, the computer, left out that . . . we asked him why

15

were you at this location according to the phone and he never gave really a true answer stated that oh I want to call somebody, I might have went down the Burns road which is 1178 runs kind of parallel to 361; I might have went down there and looked for the . . . did not give a true specific answer.

Q.      So the whole business of going down 361 he gave you two or three different versions, is that right?

A.      Yes, sir.

Detective Cammack also testified as to several text messages sent between Defendant and his wife, all of which suggested to him that they had separated in November 2014.

At trial, Defendant testified concerning the alleged inconsistencies in his statements, and the following colloquy took place between Defendant and the State's counsel:

Q.      The first time you were question[ed], you didn't say anything about taking Shelly to the hospital?

A.      No I didn't.

Q.      The second time in July, they were telling you that they had looked at your phone, right?

A.      Yeah, well I knew they were, yeah.

Q.      You knew that was happening?

A.      Yeah, I gave them my phone.

Q.      And they asked you about going to Bunkie?

A.      Bunkie General, yes.

Q.      Well the Bunkie area?

A       Yeah.

Q.      And that's when you told them oh I took her to the hospital?

A.      Yes.

16

Q.  You didn't think that was important to talk about the first time?

A.  When Shelly died and I was being accused.

Q.  You were being questioned, okay?

A.  Mr. Mike, when Shelly first died, I said what I could remember.

Q.  Right, and then you said you had sex with a woman you believed had miscarried that day, right?

A.  When we had sex, we kind of figured she didn't have a miscarriage.

Q.  She was so sick, you said, that you actually took here [sic] to the hospital?

A.  That morning, early that morning, we had sex that night.

Defendant also explained that, while he had been accused of adding details to each of his statements, "at the time I wasn't thinking in a lot of detail."

Multiple witnesses who had responded to the scene following the fire testified that Defendant did not assist in extinguishing the fire at issue, despite Defendant's experience and training. At trial, Defendant explained that his police training included domestic abuse training, and he stated as follows regarding his firefighter training: "[Y]ou know you show up at the fire station and take the hoses off the truck and put new hoses on the truck, that's considering training, because you're familiarizing yourself with the truck and the hose." Defendant also indicated that he had never responded to a house fire within the city limits of Evergreen.

Defendant testified as follows when asked about any attempts to assist Chief Armand, who was first to arrive at the scene.

A.  When I saw the fire truck, I didn't see him at first, when I saw the fire truck, I took off running from my back yard because before that I was looking for Shelly, I thought she might have been on the porch at the neighbor's house across the street next door, [I] collapse[d] in the yard, I was looking for her, I didn't want to believe she was still in the house, then I saw the fire truck.

17

. . . .

A.     I thought he was going to stop by drive way [sic], you know but he drove to where the fire was on the end of the house, I saw this, because I'm on the ground, I'm on my hands and knees and I'm trying to scream his name, and my voice cuts out, I can't scream, I see Clint's [Armand's] legs on the other side of the fire truck from underneath I can see him running, I seen the fire hose, when I saw him come around, I said come on and I got up and I ran under my car port [sic], I thought he was behind me with the fire hose, it's not his fault, he was our hero that morning but he went to the fire, he didn't go to go in the house, he ran straight to the fire which was the window, I couldn't open the car port [sic] door and I couldn't understand why, but I didn't come out my car port [sic] door, so I started kicking that door in when I kicked it in I heard Nikki Ducote, the Bunkie fireman scream Charles get out of the way and he's running with the hose and I said there's bullets, there's bullets because the popping and he said no don't worry about it, get out of the way and I got out of the way and I collapse[d] right there in front of my police care [sic] which was by my carport and someone, I don't know who walked me to my 18 wheeler across my yard and I was sitting against the fuel tank, against the truck, trying to catch my breath, crying[.]

Several witnesses at the scene following the fire also testified that they saw Defendant's "turnout gear" under the carport of Defendant's residence. According to Defendant's testimony at trial, his jacket and pants were in the carport and his "no maze hood," helmet, and gloves were in the trunk of his vehicle. There was also evidence that a police radio found in Defendant's residence was working and communications could be heard coming through it.

When questioned at trial about his efforts to extinguish the fire, Defendant explained that responding to a fire at his own residence was different than responding to a fire from another location because he did not have time to mentally prepare. He stated that, at the time, he did not think about going to the station to get the fire truck. He also testified that he did not consider using his turnout gear, but that "[he] could have had every piece of gear on and [he] wouldn't have been in [his] right mind." Defendant also stated that, at the time, he did not consider going the short distance

18

to the fire station, despite knowing the code to the station and that there was a key inside the fire truck. Defendant also testified as follows regarding the police radio identified at the scene:

> It wasn't a radio, it was the pager I heard, the fire pager is one way, you can hear, but you can't talk in it, that was by the back door by my radio, I mean I could have grabbed my radio, but I didn't think I had what I had with me and I didn't even call dispatcher's number, they had a 253-4000 number, I called 911 and I went back in the house

During trial, Defendant denied killing Shelly, but acknowledged that he and Shelly were the only people inside of the house before the fire and he did not believe a third person started the fire. Defendant further admitted that Shelly would still be alive if he had not been a coward. He also stated that he did not start the fire or know how it started.

The State's expert, Deputy Fire Marshal Hawthorne, testified at trial concerning the cause of the fire. He ruled out natural gas, electricity, and weather as potential causes. He further indicated that he did not find any remnants of cigarettes or candles; however, he did suggest that a glass remnant found at the scene could have been a candle holder or a drinking glass. He also noted that samples taken from the scene tested negative for flammable liquids and he had not found any products in the area that could have been an ignition source. He also indicated that there was no evidence of a flash fire.

Mr. Hawthorne ultimately concluded that Defendant had intentionally set the fire to conceal Shelly's murder, based upon the following circumstances. First, in his opinion, the fire was minimal at the time of the initial 911 call and Defendant should have been able to get Shelly out of the bedroom, either by walking into the bedroom and carrying her out, or by rescuing her through a bedroom window. Also, the demarcation line of the fire was five or six feet, which would have given

Defendant room to safely move around in the residence. In addition, as a trained firefighter, Defendant should have been able to put on his bunker gear and extinguish the fire with the hose found near the back door, and Defendant's only explanation for not using the fire truck or gear available to him was that he had panicked and did not think about it. Mr. Hawthorne also opined that Defendant was the only person that could have set the fire, since the autopsy report showed that the victim was dead before the fire. He also noted Defendant's inconsistent statements.

Mr. Hawthorne testified as follows concerning his opinion regarding the cause of the fire:

> Sir, we take all the data, we take everything we gather and we take all the witness statements, we take [Defendant's] own testimony, we take the autopsy report, we take the lab results, we take the actual scene itself, everything together is put together. And several hypothesis' [sic] are created. And then we eliminate one at a time on being possible or not. So we was able to eliminate everything. [Defendant] told us several lies, the calculations of the fire's growth and development, the fire's intensity patterns, the amount of time he spent there, 11 minutes waiting on the fire department and you had very limited damage to the room. All that taken into consideration leads you to an incendiary fire cause.

Dr. Christopher Tape, who performed an autopsy of Shelly's body on March 23, 2015, also testified at trial. He was accepted as an expert in forensic pathology. He ultimately was unable to determine the cause and manner of Shelly's death, but he did conclude that she had died prior to the fire. Dr. Tape ruled out the fire, as well as gunshot wounds and stab wounds, as causes of death. While Mr. Hawthorne had testified that there was a hole in right side of Shelly's body that was leaking blood when her body was discovered, Dr. Tape opined that the fire caused the hole.

Dr. Tape also ruled out the possibility of natural death. He stated that even though he could not absolutely rule out a seizure death, he indicated there was no history of a seizure disorder. Therefore, according to Dr. Tape:

So it kind of leaves us with the cause of death that will kill you without leaving a mark on your body.  And there are some ways to do that.  One way is smothering, one way is different strangulation techniques that may or may not leave any injuries.  And particularly when . . . all the skin burned away . . . there's no injuries to see there anymore.  So it's kind of left me with what are the causes of death that don't leave any injuries.  And we have to talk about some terminology.  Choking is you eat the food particle and you choke on your hot dog . . . .  That's chocking [sic], that's external.  Strangulation is external you can have manual strangulation with your hand, your arm, legs even and then you have ligature strangulation which is rope, belt, and other kind of scarf.

Dr. Tape then indicated he was not able to rule out choking or strangulation as potential causes of death.  While he noted that Shelly's hyoid bone was still intact with no fracture, he stated that ten to twenty percent of strangulation cases do not result in a broken hyoid or larynx and it was "not uncommon for them not to break."  He further testified that Shelly was thirty-one years old at the time of her death, "so she may still be that age where [her bones] are somewhat flexible."  He further explained the "carotid sleeper" choke hold:

> basically . . . there are ways to kill a person without leaving a mark on them.  One of them is the carotid ceproble [sic] and what that basically is is rather than choke with your hand, you take your upper arm and your lower arm and the jugular and carotid are right here so what I can do is if I come across straight here, I can cross this airway.  But if I come like this and do like that, then I can really crank that down, I can cut off the jugular and the carotid and knock the airway.  Looks like a mixed martial arts move.  And people will go unconscious from that within ten seconds.  And there are reports of death within under a minute and normally you think well if you're cutting off your oxygen it should take you three or four minutes to die.  Something else is going on here it's the cutting off of that blood somehow causes this death rarely [sic] So again that's away [sic] to kill somebody without leaving a mark potentially.  And especially when you have a burned body with no petechial hemorrhages.  But this is something that probably would cause petechial hemorrhages.  But again it has something to do with how long you do it.  But death happens very quickly, it's probably not going to be time for that pressure to build up.  So there's a lot of factors and variables.  But there are ways you can kill a person without leaving a mark on them.  And one of those ways is to smother him

Dr. Tape also explained that if one were to perform the "sleeper hold" while pulling back and lifting up the body, more pressure would be applied, potentially resulting in a quicker death.

Dr. Tape also discussed smothering as a cause of death that would not leave injuries, explaining

> You just eclude [sic] this area right here, you can do it with your mouth, pillow whatever, that's going to cause the same thing and you can't breathe. You're going to die eventually depending on how long it's held there. But because there's no real pressure you're probably not going to get petechial hemorrhages. And you may or may not get other injuries on the body.

He further noted that in this case, petechial hemorrhaging was not visible because the skin and eyes had been burned.

Dr. Tape also testified that toxicology tests indicated the presence of Paxil, but that, in his opinion, Paxil did not cause or contribute to Shelly's death, and there was no evidence of overdose. Further, while he indicated he could not rule out suicide as a cause of death, for Shelly to have committed suicide, it would have had to have been by asphyxiation or strangulation that she would have had to do to herself or with someone else's assistance.

Dr. L.J. Mayeux, the doctor who directed the performance of an autopsy on Shelly, also testified at trial. He indicated that he did not perform the autopsy and did not go to the crime scene. At trial, he was accepted as a coroner and an expert in the fields of family medicine and forensic medicine.

After reviewing the information given to him, he agreed with Dr. Tape's conclusion that Shelly did not die from the fire. He further testified that the charring of Shelly's body made it impossible to distinguish between a thermal burn, thermal laceration, and a traumatic injury. He also explained that the "post-mortem boxer

like body posture" that Shelly's body was found in resulted from dehydration from the fire and the shrinking of the body and muscle tissue. Dr. Mayeaux also concluded that Shelly had died prior to the fire, noting that the carbon monoxide levels were less than 5%, there was no soot in her airways, and her lungs were normal. He further ruled out seizure as a potential cause of death.

Dr. Mayeux also testified that Shelly's use of Paxil, a common anti-depressant, was not indicative of suicidal behavior, and opined that it is nearly impossible for someone to suffocate themselves.

Dr. Mayeaux further explained that certain choke hold strangulations and smothering could cause death without injury, noting there were multiple ways of suffocation without fracture of the hyoid bone, including a "sleeper hold," which he described as follows:

> If you are right handed your right arm would go around the victim's neck and then your left arm . . . hand would connect to the forearm and you'll put pressure . . . you can either go down with your pressure or backwards with your pressure, or sideways. And that normally cuts off the airway and/or the blood supply to the head. They call it the sleeper hold because it can be an instant thing, passing out. If you do it long enough sustained lack of oxygen to the brain, you get brain death.

He indicated that less than 2% of cases involving the "sleeper hold" resulted in hyoid fractures.

Ultimately, Dr. Mayeux concluded in a supplemental report that the cause of Shelly's death was undetermined, but that manner of death was a homicide. He testified as follows concerning his conclusions:

> I have reviewed the following documents certificate of death, the original autopsy report from Dr. Tape, supplemental report from Dr. Tape completed May 26th of 17, incident investigation report from the office of the state fire marshal, incident report, supplement from the office of fire marshal and transcription of testimony taken on September 26 of 16 from the State of Louisiana versus Charles Mayeux. After reviewing these documents I am of the opinion that I would now

change my opinion as to the manner of death from undetermined to homicide. First it is clear to me that Shelly Mayeux did not die from a fire but she was dead prior to the fire. . . . - - - the state fire marshal has ruled out flash fire. Dr. Tape finds there was no natural cause of death. I do find there is substantial evidence of death by homicide and no evidence of death by suicide or accident. I believe the evidence of domestic violence by [Defendant]to his first wife and to the mother of his two children is important. Both women reported that Charles Mayeux choked them from behind. Shelly Catherine Mayeux appeared at work with bruises on her face, neck and arms and . . . domestic violence. Charles Mayeux had a history of excessive telephone calls to his wife at work and threats over the phone. I agree with Dr. Tape that there are no natural cause [sic] of death. I clearly believe that the most likely cause of death was smothering with hand, pillow or other object and special manual strangulation techniques such as carotid sleeper hold.

In view of the most recent report by Dr. Tape and the evidence submitted by you as outlined in this log, the manner of death of Shelly Catherine Mayeux should now be classified as homicide and the death certificate will be amended to reflect so.

Dr. Adel Shaker also testified at trial and was accepted an expert in the field of forensic pathology, forensic medicine, anatomic pathology, and general medicine. He agreed that Shelly had died prior to the fire. Dr. Shaker reviewed both Dr. Tape's initial and supplemental reports, but he did not agree that Shelly could have been killed by a chokehold. According to Dr. Shaker, a rear neck chokehold, choking, or strangulation was unlikely since she had no injuries to her tongue. He further indicated that a "choke hold like we demonstrated with the V pattern" would not show any visible injury to the neck, "[f]or a short time like 10-15 seconds. But beyond that there will be bruises[,] contusions, hemorrhages."

Dr. Shaker further concluded that he did not exclude a chokehold or smothering as possible causes of death, but further noted that, unless Shelly was infirm or intoxicated, she would fight for her life during smothering, resulting in defensive wounds.

24

Detective Cammack, who had interviewed Defendant concerning the fire, also provided the following conclusion at trial:

> After taking the information from the report, after obtaining the information from the facts that Shelly Mayeux was dead prior to the fire, that she should have moved in some type of way because of the fire being set near her, the fact that the fire investigators ruled this fire was incendiary which is a set fire to relinquish any type of evidence the probable cause was established to obtain arrest for Charles Mayeux for the second degree murder of his wife.

When asked about a potential motive for the murder, Detective Cammack indicated that Defendant and his wife had financial problems, noting unpaid bills, a vehicle in poor condition, and that Defendant had pawned his service weapon. Defendant testified that at time of Shelly's death, he was $200 behind on his water bill, Defendant's Jeep was paid for but broken, and Defendant had pawned his weapon.

There was also evidence at trial that, about a month before Shelly died, $10,000 life insurance policies had been written for Shelly and Defendant. Defendant testified that because the $10,000 policy was insufficient to pay for Shelly's funeral expenses, Shelly's parents had paid for her funeral. He stated that since Shelly's death, he had received various donations from the fire department and others.

At trial, several witnesses were called to testify concerning the relationship between Defendant and Shelly. Shelly's mother, Sheila St. Romain, testified that Shelly and Defendant had been married for ten months and Shelly was thirty-one years old when she died. She testified that she was not aware of violence between Shelly and Defendant. She described Shelly as thin and weighing approximately 110 pounds, but explained that she would defend herself if necessary.

At the time of her death, Shelly worked in the booking department of the Avoyelles Parish Sheriff's Office. Several of Shelly's co-workers testified that Defendant would call Shelly frequently at work, and they often argued. One witness testified that in an eight-hour day, Defendant called Shelly thirty-six times, whereas another testified that Defendant would call as many as fifty times a day. Several of the co-workers also testified that on one occasion when Shelly had Defendant on speaker phone during a conversation, they heard Defendant state that if he could not have Shelly, then he was going to kill her. There was also testimony suggesting that Defendant would wait for hours in the parking lot for Shelly. When questioned about the calls during trial, Defendant admitted that he would call Shelly often and they would argue over the phone. He described Shelly as "feisty and fearless."

One of Shelly's co-workers also testified that Shelly had come to work one day at the end of January 2015 "with hand prints around her neck, a black eye, and a mark behind her ear." She testified that when she asked Shelly what happened, Shelly indicated that Defendant had choked her because she refused to have sexual intercourse with him. The co-worker then reported the incident to the captain. Another co-worker stated she had seen Shelly with hand print marks around her neck, two black eyes, and what looked like cigarette burns.

Similarly, another co-worker testified that about sixty days before Shelly's death, he had noticed that Shelly had a black eye and bruising on her neck "consistent with . . . fingers or a hand grabbing on the side of her neck." He indicated that Shelly had hesitantly explained to her that she and Defendant had gotten into a fight the night before and Defendant had hit her. This testimony was confirmed by another co-worker who spoke to Shelly at the same time regarding this incident. The trial court, on multiple occasions, instructed the jury that testimony concerning

26

statements made by Shelly to her co-workers was being presented as evidence that a report of an incident had been made, and not for the truth of the statement given.

Doug Anderson, Sheriff of Avoyelles Parish, also testified that it had come to to his attention that Shelly was being abused by Defendant and that Shelly agreed to talk with him about it in mid-January 2015. The trial court again instructed the jury that anything Shelly told the sheriff was being offered to show a report was made and was not being offered for the truth of the statement. He testified that Shelly stated she was not being abused by Defendant and that he did not recall seeing any marks on her. He said that he stressed to Shelly that she needed to press charges, but she pled with him not to.

At trial, Defendant denied ever physically fighting with or abusing Shelly, and he further denied threatening to kill her. He accused Shelly's co-workers of lying when they stated they saw marks and bruises on Shelly and heard him threaten Shelly over the phone. When questioned concerning text messages between him and Shelly in January 2015, wherein Shelly indicated she was not returning home, he acknowledged that they were arguing, but they had not separated. The following is a colloquy between the State's counsel and Defendant regarding text messages sent between Shelly and Defendant:

> Q.    What about February 27, 2015, less than three weeks before she died, Shelly died, what were doing [sic] that day, need to show you that message, January 16, 2015, this is . . . to you, would you read that one please, number 33?
>
> A.    I don't believe you Charles.
>
> Q.    And then you said to her?
>
> A.    You got to, you have nothing to lose, if I'm wrong, you leave happy.
>
> Q.    Now, this is what Shelly responded to you, right?

A. I'm not coming home, you're just going to beat my ass when I get there, come home we can put on the Cisco CD.

Q. Did she frequently accuse you of beating her?

A. That was her talking smack to me.

. . . .

Q. But, this is serious, she's trying to tell you that she doesn't want to come home, you're trying to beg her to come back, then she says you're going to beat my ass if I come back?

A. And then there's a joke about putting on the Cisco CD, we were joking around.

Joshua Johns, a detective with the Avoyelles Parish Sheriff's Office, also testified at trial. He stated that he received a complaint on March 2, 2015, indicating that Defendant and Shelly were arguing in the parking lot of the Sheriff's Office. When he responded to the complaint, he saw Defendant and Shelly driving out of the parking lot, and he stopped their vehicle. Detective Johns testified that he did not see any signs of battery, and that neither wanted to press charges. Defendant denied that he or Shelly were yelling or screaming at the time, despite the reported argument.

Two witnesses also testified at trial concerning prior acts of violence towards them by Defendant. Valerie Carroll testified that she lived with Defendant between 1999 and 2002, and, during this time, Defendant physically abused her at least once a month, sometimes three times a month. She indicated that he would slap her face, choke her, pull her hair, shove her, and push her to the floor. She explained that sometimes he would choke her from the front with his hand on her throat, and that sometimes he would come from behind her with his right arm, choke her, and lift her against him. She indicated that when he choked her from behind, she would almost lose consciousness.

28

Ms. Carroll also testified that Defendant had physically abused her when she was seven months pregnant, explaining that during a fight, he had pushed her down to the floor, "pulled my hair in his hand, he kneed me in the back, kicked me in the side, slammed my head on the floor and this was all in front of my three year old."

Ms. Carroll explained that the abuse happened for financial reasons, that Defendant was cheating, and that she did not want Defendant to party with his friends all the time. She testified that he had threatened to beat her up and to kill her, once while holding a gun to her head.

Defendant admitted at trial that, on one occasion when he and Ms. Carroll were arguing, Ms. Carroll threw a whisky bottle at him, and then Defendant placed his forearm across Ms. Carroll's chest and pinned her against the wall. Defendant further admitted that, during an argument, he had probably threatened to kill Ms. Carroll. However, he denied ever choking or hitting her. He further stated that he and Ms. Carroll were not together when she was seven months pregnant, and he accused her of lying concerning the alleged incident when she was pregnant.

Adenia Jane Smith,[1] who was married to Defendant from February 2008 until June 2011, also testified at trial. She stated that Defendant physically abused her by slapping, choking, and hitting her and that he was also emotionally and verbally abusive. She explained that when Defendant would choke her, he would do so by reaching around her neck from behind her, and that there were times she could not breathe, but she did not lose consciousness. She testified that this happened more than once a month and explained the reasons for the altercations as "[m]oney, jealousy, things like that, sex kind of depended on what we were fighting about at

---

[1] This witness is later referred to during trial as Athena, or Jane Athena.

the time." She further indicated that Defendant threatened to kill her with a gun and that a few times she believed him. She agreed, however, that she did not allege abuse when she filed for divorce.

Ms. Smith also testified that after she and Defendant divorced, she had received a message from Defendant in February 2015 stating that he needed to talk with her. According to Ms. Smith, on February 27, 2015, Defendant drove to her placement of employment in Natchitoches, she got into his vehicle, and Defendant told her he and Shelly fought all the time and he wanted to divorce her. Ms. Smith also stated that Defendant mentioned going back to her apartment to have sexual intercourse, but that she had refused to do so.

Defendant testified as to a physical encounter with Ms. Smith as follows:

A.    I was having trouble, I had a girlfriend once that was killed by a drunk driver and she was sober, she was the sober one, and she died and I had trouble dealing with that and I would always talked [sic] about her and Jane thought I was comparing her to the girl and she told me I'm not going to compete with a dead girl and I pushed her and she kicked me between the legs and while I was on the ground, she was laughing and I grabbed her by the ankles and I picked her up she fell on her butt, I didn't punch her, I didn't go that ninja . . .

Q.    Have you ever punched a girl?

A.    No.

Defendant further admitted at trial that he and Ms. Smith had met in Natchitoches in February 2015. He explained that he and Shelly had been arguing, but he denied stating that he wanted a divorce or that he asked Ms. Smith to have sexual intercourse with him. He accused Ms. Smith of lying.

The defense also called several witnesses at trial concerning Defendant's relationship with Shelly. Several witnesses, including Defendant's former co-worker, Chief Ernest Anderson, and Defendant's neighbor and co-worker, Mike

Ducote, testified that they had never witnessed anything suggestive of an abusive relationship between Defendant and Shelly. In addition, Kayla Brevelle, who had formerly dated Defendant for three months, and Amanda Volker, who had formerly dated Defendant for eighteen months, both testified that Defendant was not abusive towards them during their relationships. Ms. Brevelle further testified that she worked with Shelly until April 2014 and did not observe any marks or bruising on Shelly during that time. Chief Armand, who was close friends with Defendant and Shelly, and who saw them almost every day, also testified that he had never seen Defendant act aggressively towards Shelly or any marks on Shelly indicating abuse. In addition, Defendant's landlord, Shirley Devillier, testified that she never received any calls regarding any disturbances at Defendant's residence and she never saw any evidence of abuse of Shelly.

**Analysis**

On appeal, Defendant urges us to find that the State failed to present sufficient evidence that Shelly was killed by Defendant (or anyone else), or that Defendant had the specific intent to kill or inflict great bodily harm upon Shelly. Defendant argues as follows in his brief to this court:

> The State failed to prove beyond a reasonable doubt that Shelly died at the hands of another, much less that [Defendant] was in any way involved. The two pathologists could not provide a cause of death. A seizure death was not ruled out, heavy metals was not ruled out, . . . it is not clear that all other viral infections were eliminated. Death as a result of an injury was ruled out as there was no damage to any of the organs that would have resulted in her death and there was no sufficient loss of blood as her organs still retained the proper coloring. Dr. Tape noted in the autopsy report that Shelly suffered from cardiovascular disease and moderate to severe nefphosclerosis of the kidneys, although he opined that the natural diseases, coupled with the positive toxicology was probably not enough to cause death. He did not rule out the possibility of a heart attack, although he testified it was highly unlikely. Dr. Tape did not rule out the possibility of suicide. Dr. Tape testified that a body with no apparent injuries and no apparent cause of death

31

does not happen often. Both pathologists discussed strangulation and smothering as possible causes of death but neither concluded this was the actual cause of Shelly's death. The hyoid and larynx were intact. Dr. Tape testified that the hyoid could remain intact in ten to twenty percent of strangulation cases, although Dr. Shaker believed the number to be much less, especially if the victim was in a position to struggle. Dr. Tape testified that the top of the larynx was easily broken during strangulation. Dr. Shaker was more emphatic that had she been choked or strangled there would have been injuries to the muscles and tongue that would have been visible, even with the charred body, yet Dr. Tape's report indicated there were no visible injuries to these areas. . . . The totality of the testimony indicates that death by strangulation or choke hold was not proven to the be the [sic] cause of death. Dr. Mayeux, who was not a forensic pathologist, offered little to the discussion as to the pathological findings, although he opined a seizure death was unlikely as adult onset seizures without underlying markers, such as a tumor, were rare.

In response, the State stresses on appeal the deference that should be shown to a jury's rejection of a defendant's hypothesis of innocence and argues in brief that:

[T]he jury could rationally view all the evidence in this case as proving the cause of death was either a strangulation or suffocation, caused by a physically abusive spouse who choked at least one prior wife and one prior girlfriend, of which one is the mother of his two children; who intentionally burned his wife's body, retarded the first responders and lied repeatedly to investigators and the jury about his whereabouts and his explanations for his actions.

On review, we note that the record does not contain any direct evidence that Shelly was murdered, that Defendant killed her, or that Defendant started the fire at issue. However, various circumstantial evidence apparently led experts to conclude Shelly had died before the fire and the fire was intentionally set to cover up a homicide. Both conclusions were based on expert opinions reached by scientific methods that excluded other ways Shelly could have died and other ways the fire could have been started. The jury was made aware of these expert opinions and heard defense counsel challenge these opinions through its cross-examination and testimony elicited from Defendant's own witnesses and expert. The jury seemingly

chose to believe the State's experts that Shelly was killed by some type of choking

or strangulation that left no injuries and that the fire was intentionally set to cover

up the homicide.

This court recently addressed a similar circumstantial evidence case in *State*

*v. Vail*, 17-354 (La.App. 3 Cir. 12/28/17), 236 So.3d 644, stating the following:

> In summary, the jury heard extensive testimony from three expert witnesses regarding whether Mary Horton Vail was dead before she entered the water or died after she entered the water. The experts also offered opinion testimony as to the events surrounding her death, based on the reports and evidence available to them as well as their opinions pertaining to the cause of death. Two of the experts concluded the manner of Mary Horton Vail's death was a homicide. One testified that he concluded the death was an accidental drowning. The jury heard the testimony of all three experts in great detail, viewed the photographs, and read the autopsy report. Faced with conflicting expert opinions, the jury was entitled to accept whichever one, in their opinion, better explained the facts of the incident. La.Code Evid. art. 702. An appellate court should "not disturb the jury's choice to accept one expert's opinion unless that opinion is patently unsound." *State v. Ellis*, 28,282, p. 5 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, 623, *writ denied*, 96-1991 (La. 2/21/97), 688 So.2d 521. After reviewing the experts' testimony in their entirety, we do not find the expert witnesses' opinions of the cause and manner of death to be patently unsound.
>
> In great part, most of the witnesses in this case presented evidence that was circumstantial in nature. This evidence consisted of contradictory statements made by the defendant, information from officers and investigators regarding the disappearance of two other women connected to the defendant, information regarding life insurance policies, testimony . . . that contradicted the defendant's statement that his wife accidentally fell into the river, and testimony regarding the relationship between the defendant and the victim at the time of her death.
>
> The testimony of three of the state's witnesses, however, is not circumstantial in nature. Wesley Turnage, Robert Fremont, and Bruce Biedebach all testified regarding statements the defendant made to each of them at different times wherein he stated to them that he killed his wife.
>
> . . . .
>
> In the current case, the jury obviously concluded the three witnesses to whom the defendant stated he killed his wife were worthy

of being believed. The jury seemingly believed Dr. Welke's conclusion that Mary Vail was dead when she went into the river late that evening or Dr. Baden's theory that she may have died in the water as a result of foul play. They heard testimony that she was fearful of being in "dark water" and never went out in the defendant's boat during the daytime, yet she allegedly went fishing with the defendant after dark. The jury also had the opportunity to peruse the Calcasieu Parish Sheriff's Office investigation report compiled in 1962 describing the direction of the investigation and the concerns being addressed to determine what happened to Mary Vail. While the report did not offer any conclusions or explanations, it did reflect the defendant's attitudes and behavior at the time of Mary Vail's death.

. . . .

Moreover, whatever was the cause of Mary Vail's death, strangulation, suffocation, or a blow to the head, the fact that the defendant attempted to cover up the offense by trying to convince the police that she accidently fell overboard was sufficient evidence for the jury to conclude he had specific intent to kill her. "[S]pecific intent is a state of mind, and need not be proven as a fact, but may be inferred from the facts and circumstances of the transaction and the actions of the defendant." *State v. Boyer*, 406 So.2d 143, 150 (La.1981). "Specific intent is an ultimate legal conclusion to be resolved by the fact finders." *State v. Graham*, 420 So.2d 1126, 1128 (La.1982).

The evidence, in this matter both direct and circumstantial, the testimonies, documents, and the defendant's statements, viewed in a light most favorable to the prosecution, contained enough information to exclude the defendant's assertion of innocence and supports the jury's finding that the defendant killed his wife, Mary Vail.

*Vail*, 236 So.3d 644 at 668-69.

Although *Vail* is distinguishable from the present case in that there was direct evidence of the defendant's guilt, we find that *Vail's* analysis of the jury's verdict and its deference to conclusions drawn by the jury are helpful. In *Vail*, there was expert testimony that the victim had died prior to entering the water where she was found. Similarly, in the instant case, there was expert testimony that Shelly had died before the fire that burned her body. The experts in the instant case also ruled out the likelihood of natural or accidental causes of death, as well as suicide.

Additionally, the experts excluded all causes of the fire except for an intentionally set fire to cover up a homicide.

Also as in *Vail*, the jury in the instant case did not have to rely solely on the experts' opinions, but was able to draw its own conclusions from the rest of the evidence introduced. The jury heard evidence suggestive of a volatile relationship between Shelly and Defendant, including Defendant's threats to kill Shelly, co-workers' observations of bruises and handprints on Shelly's neck that she attributed to Defendant, and Defendant's own testimony that he and Shelly routinely fought.

The jury also heard evidence that Defendant had previously choked his prior wife and ex-girlfriend and was able to compare this testimony with the expert testimony that Shelly possibly died by a chokehold or by suffocation that did not leave any injuries. The jury was also able to weigh this expert testimony against testimony from the defense expert, Dr. Shaker, suggesting that a rear neck chokehold would have likely caused injury to the victim's tongue and no such injuries were noted on Shelly.

Additionally, the jury heard Defendant's testimony concerning the events the day Shelly died, including his initial report that Shelly was vomiting and then subsequent statements that she feared she was having a miscarriage. The jury also heard evidence indicating that in his initial statement to police, Defendant did not mention taking Shelly to the hospital, but then, in a subsequent statement, revealed this information. Additionally, in his first statement to police, Defendant did not mention that he went on rounds the day before the fire, or that he chased after a horse that had gotten loose. The jury also heard testimony regarding the location of Defendant's cell phone and whether it was consistent with the location where Defendant claimed to be at the time.

The jury also heard testimony that it was unusual for Shelly to not to pick up Defendant's check, not be with the Defendant when he picked up her two sons, and to not text her daughter's stepmother regarding her visitation. Furthermore, the jury heard Mrs. Bordelon, stepmother to Shelly's sons, testify that Defendant told her he was late picking up the boys because he was having a broken tooth fixed.

Through all of the evidence and arguments at trial, the jury was made aware of Defendant's hypothesis of innocence that Shelly died of some type of natural cause – a stomach virus, staph from a boil, a miscarriage, a possible seizure, and possible cardiovascular disease. The jury also heard Defendant's hypothesis that Shelly died suddenly while holding a lit candle, causing the candle to fall and catch the house on fire. Obviously, the jury rejected these hypotheses.

The supreme court has stated:

> To preserve the role of the fact finder, *i.e.,* to accord the deference demanded by *Jackson,* this Court has further subscribed to the general principle in cases involving circumstantial evidence that when the fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'" *Id.* (quoting *Jackson* ). Thus, in all cases, the *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder. *State v. Pigford,* 05–0477, p. 6 (La.2/22/06), 922 So.2d 517, 521; *State v. Robertson,* 96–1048 (La.10/4/96), 680 So.2d 1165, 1166. A reviewing court may impinge on the "fact finder's discretion . . . only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988).

*State v. Mack*, 13-1311, pp. 9-10 (La. 5/7/14), 144 So.3d 983, 989.

Considering all of the evidence introduced at trial in a light most favorable to the prosecution, we conclude that it was rational for the jury to find beyond a

reasonable doubt that the essential elements of second degree murder were proven and all reasonable hypotheses of the Defendant's innocence had been excluded.

## ASSIGNMENT OF ERROR NUMBERS 2 AND 4

Defendant's second and fourth assignments of error challenge the trial court's rulings allowing the State to elicit testimony from Defendant's ex-wife and a former girlfriend regarding alleged physical abuse during their relationships with Defendant, as well as testimony from several of Shelly's co-workers who allegedly had conversations with Shelly concerning abuse by Defendant and witnessed bruising on Shelly's face and neck.

A pre-trial hearing was held on September 27, 2016, in accordance with La.Code Evid. art. 404(B), regarding the admissibility of testimony from Defendant's ex-wife, Defendant's former girlfriend, and six of Shelly's co-workers as "evidence of other crimes, wrongs or acts." The trial court rendered Reasons for Ruling on February 21, 2017, wherein it found that the probative value of the evidence substantially outweighed any possible prejudice to Defendant and ruled the testimony was admissible at trial.

During trial, a separate hearing was held concerning the admissibility of statements that Shelly made to various co-workers before her death, which Defendant argued was inadmissible hearsay. The State argued these statements were admissible as a rebuttal to prior testimony suggesting that Shelly did not report any abuse by Defendant and because the Fire Marshall's report, which had already been accepted into evidence, included the statements of these co-workers. The trial court ultimately found the testimony permissible, noting that Shelly was unavailable, as contemplated by La.Code Evid. art. 804.

37

Absent clear abuse, we will not intrude on the broad discretion of a trial court in evidentiary decisions. It is within the trial court's province to determine the potential for prejudice afforded by certain evidence and testimony and the degree to which such prejudice might exceed probative value and taint the jury verdict.

*Nugent v. Cont'l Cas. Co.*, 634 So.2d 406, 408 (La.App. 3 Cir. 1994). Further, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" La.Code Evid. art. 103(A).

**Testimony from Ms. Smith and Ms. Carroll**

On appeal, Defendant challenges the trial court's ruling allowing the State to elicit testimony from Defendant's former wife, Ms. Smith, and from Defendant's former girlfriend, Ms. Carroll, as evidence of "alleged other crimes/bad acts." These witnesses provided testimony concerning alleged physical abuse during their relationships with Defendant. Defendant argues that the State's reliance on this testimony to show motive was unfounded since the evidence was not factually particular to Shelly and the crime with which Defendant was charged. Defendant also argues that he was unfairly prejudiced by their testimony, as it "provided a connection the State did not otherwise have to support the conclusion that Shelly died by strangulation."

In response, the State asserts that the testimonies of these women were relevant to show "the motive, intent, opportunity, preparation, plan, knowledge and identity, absence of mistake or accident of Mayeux, along with showing his propensity for violence against those with whom he was involved in a romantic relationship."

Louisiana Code of Evidence Article 404(B) provides, in pertinent part:

> **Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In *State v. Rose*, 06-402 (La. 2/22/07), 949 So.2d 1236, the supreme court addressed the admissibility of other crimes evidence in connection with a second degree murder trial following the death of the defendant's wife. The evidence included the defendant's previous conviction for the manslaughter of his former wife, his convictions for violence perpetrated against his former wife, and his arrest for domestic violence against the victim. The supreme court found the evidence was admissible as it was "highly probative to show defendant's identity, pattern, system and motive, and his vicious attitude toward women with whom he shares a close personal relationship." *Id.* The supreme court reasoned:

It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts.

. . . .

. . . . We find the State proved defendant committed the other crimes, wrongs or acts by clear and convincing evidence. Defendant was convicted of manslaughter and of the prior crimes committed against Monica Young Rose. The case against defendant for municipal

domestic battery against Ms. Rose [(the victim of current offense)] was not resolved at the time of Ms. Rose's murder. At trial, defendant gave his version of the facts surrounding each of the other crimes or wrongs introduced and did not deny he was the same person involved in the incidents at issue.

. . . . The identity of the perpetrator was a material issue at trial because defendant claimed he did not kill Ms. Rose . . . . This court has allowed the use of other crimes evidence to show *modus operandi* or system as it bears on the question of identity when the prior crime is so distinctively similar to the one charged, especially in terms of time, place and manner of commission, that one may reasonably infer that the same person is the perpetrator in both instances. "[T]o assure that *modus operandi* evidence involving crimes or acts similar to the charged offense does not become a passkey to the introduction of the character and propensity evidence that La.C.E. art. 404(B) prohibits, this court has 'closely analyze[d] the . . . transactions in order to determine whether they . . . exhibit such peculiar modes of operations to distinguish them as the work of one person.'" The assessment of this standard is fundamentally a balancing process[,] . . . ."[t]he greater the degree of similarity of the offenses, the more the evidence enhances the probability that the same person was the perpetrator, and hence the greater the evidence's probative value, which is to be ultimately weighed against its prejudicial effect."

As explained above, evidence of other crimes, wrongs or acts may also be introduced to establish proof of motive. For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime. Additionally, in a case in which the State sought to elicit testimony as to defendant's motive, this court observed, "Clearly, evidence that defendant and his ex-wife, the person to whom defendant's alleged criminal conduct was directed, had had a poor marital relationship and that defendant had a bad temper was relevant as tending to show the commission of the offense. . . .

In the instant case, we find the evidence that defendant physically abused Ms. Rose is independently relevant to show the volatile nature of the relationship between defendant and Ms. Rose. This evidence tends to show defendant's motive for commission of Ms. Rose's murder. The State was attempting to prove that defendant was the perpetrator of Ms. Rose's violent death. The State's case was largely dependent on circumstantial evidence, so any evidence tending to prove that defendant had a motive or reason for committing the murder was extremely probative. Defendant's documented physical abuse of Ms. Rose illustrates a motive factually peculiar to her murder.

. . . .

40

While we recognize there are clearly differences among the crimes or acts at issue, we find that, taken as a whole, the similarities are sufficiently probative as to defendant's identity as Ms. Rose's murderer . . . .

Thus, the evidence of the prior crimes was relevant not because it revealed defendant's general criminal propensities or his propensity for violence as it specifically related to women (both uses prohibited by La.C.E. art. 404(B)), but because when considered together, the crimes revealed sufficient similarities arising from a fixed and aberrant pattern of behavior that tended to identify defendant as the perpetrator in the death of his second wife. The other crimes evidence was extremely probative, especially considering the circumstantial nature of the case against defendant. The prior crimes evidence tended to corroborate the remaining evidence introduced at trial. . . . The other crimes evidence also showed defendant acted violently toward another woman with whom he had a close personal relationship, and eventually killed her during an argument. Thus, rational jurors could have found the similarities sufficiently probative to identify defendant as Ms. Rose's murderer because a specific pattern of violent and obsessive behavior earmarked the crimes as the work of one man and thereby "sustain[ed] the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict."

When the probative value of the other crimes evidence is balanced against its prejudicial effect, we find the evidence was properly admitted because it was not unduly or unfairly prejudicial. While the evidence that defendant had killed his first wife after acting violently towards her and that he had physically abused Ms. Rose was clearly prejudicial in his trial for the murder of Ms. Rose, it was highly probative to show defendant's identity, pattern, system and motive. We do not believe the prejudicial effect of the other crimes evidence rises to the level of undue or unfair prejudice when it is balanced against its probative value.

*Rose*, 949 So.2d at 1243-46 (internal citations omitted; footnote omitted).

We find that *Rose* illustrates the probative value of Ms. Smith's and Ms. Carroll's testimonies in the instant case. As in *Rose,* the instant case involves circumstantial evidence and Defendant's denial of committing the crime with which he was charged. Additionally, Defendant herein does not deny his identity as the person who committed prior criminal conduct against Ms. Smith or Ms. Carroll, but rather denies the conduct itself. The fact that both of these witnesses claim

41

Defendant committed the acts against them, despite Defendant's denial, is relevant to dispute Defendant's defense at trial that he was not involved in Shelly's death and that Shelly died of natural or accidental causes.

As for the similarities between the prior conduct and the conduct for which Defendant was on trial, we note the following: Both Ms. Smith and Ms. Carroll were in a romantic relationship with Defendant, as was Shelly; Ms. Smith and Ms. Carroll testified as to Defendant choking them during an argument; and the manner in which both Ms. Smith and Ms. Carroll described Defendant's choking was similar to the way experts testified Shelly may have died.

On appeal, Defendant argues *Rose* is distinguishable because the cause of Shelly's death is speculative and "the other crimes/bad acts evidence was used to improperly bolster this speculation." While we agree that Defendant's prior acts helped to bolster the State's witnesses' suggestions that Shelly died from Defendant choking her in a similar way that he had choked Ms. Smith and Ms. Carroll, the probative value of this evidence outweighs its prejudicial effect. As noted by the court in *Rose*, the circumstantial nature of a case weighs in favor of the probative value of such evidence. Furthermore, Defendant presented his own expert testimony to discredit the State's chokehold theory of death.

Defendant also argues on appeal that *Rose* is distinguishable from the present case because the defendant in *Rose* was convicted of the other crimes, whereas Defendant herein was not convicted of any crime pertaining to the alleged abuse of Ms. Carroll or Ms. Smith. However, regardless of the lack of a conviction, we find that the State satisfied its burden of proving the other crimes or bad acts by clear and convincing evidence, given the testimonies of both Ms. Carroll and Ms. Smith.

Therefore, we conclude that the trial court did not err in allowing the State to elicit testimony from Ms. Carroll or Ms. Smith, as their testimonies were "highly probative to show defendant's identity, pattern, system and motive, and his vicious attitude toward women with whom he shares a close personal relationship." See *Rose*, 949 So.2d at 1236.

### Testimony from Shelly's Co-Workers

Defendant also argues the trial court erred in finding that testimonies from Shelly's co-workers regarding statements Shelly made to them, identifying Defendant as having abused her, were admissible as an exception to the hearsay rule. The trial court ruled:

> [I]t appears to me quite frankly under 804, the declarant is unavailable due to death, 804 says as a here say [sic] exception, except as otherwise provided by the code, the declarant is unavailable as a witness when the declarant cannot or will not appear in court and testify to the substance of his or her statement made outside of court, including situations in number four, is unable to be present or to testify at the hearing because of death or an existing physical or mental illness, etc., in this case the alleged declarant of the statement is deceased, so that is an exception but subject to the admonition that **I'm going to give the jury that it is not made to say the truth that her husband did these things only that she reported it, okay**.

(emphasis added).

Defendant further argues that the trial court's ruling that Shelly's statements to her co-workers were excluded from the hearsay rule, is inconsistent with the trial court's instruction that the statements Shelly made to her co-workers were "only being offered for purpose to show that [Shelly] made a report not that it was true[.]" Therefore, according to Defendant, both the admission of the testimony, and the instructions given were erroneous, given their inconsistent nature.

"Hearsay is not admissible except as otherwise provided by this Code or other legislation." La.Code Evid. art. 802. Hearsay is defined as "a statement, other than

one made by the declarant while testifying at the present trial or hearing, **offered in evidence to prove the truth of the matter asserted**." La.Code Evid. art. 801(C)(emphasis added). Considering this definition, the co-workers' testimonies as to what they saw for themselves (i.e., bruises and marks on Shelly, Defendant waiting in the parking lot for hours, and Defendant arguing with Shelly) are not hearsay. Additionally, the co-workers' testimonies as to the threats they heard Defendant make to Shelly over the phone was not hearsay in accordance with La.Code Evid. art. 801(D)(2). However, the co-workers' testimonies as to Shelly's statements to them accusing Defendant of abusing her would be hearsay, *if they were offered to prove the truth of the matter asserted*, and if they are not otherwise exempted from the hearsay rule.

In the instant case, however, the trial court specifically instructed the jury on multiple occasions that the testimony concerning statements Shelly had made to her co-workers were being offered only for the purpose of showing that the statements were made, and not for the purpose of showing that what she said was true. Therefore, the statements were not "offered in evidence to prove the truth of the matter asserted," and are therefore not hearsay as contemplated by La.Code Evid. art. 801.

Defendant argues that none of the exceptions to the hearsay rule provided by La.Code Evid. art. 804(B), which are applicable to certain statements by an "unavailable" declarant, are applicable to Shelly's statements to her co-workers. While we agree that La.Code Evid. art. 804 would not provide an exception for Shelly's statements *to the extent the statements were hearsay* (i.e. were being offered to prove the truth of the statements), the trial court made clear that the statements were not being admitted for that purpose. Thus, even though the trial court

44

erroneously suggested in its ruling that Shelly's unavailability, alone, created an exception to the hearsay rule, the trial court's ultimate instruction rendered the testimony non-hearsay, and was otherwise appropriate.

We further note that the co-workers' testimonies regarding what Shelly told them had already been admitted into evidence through the fire marshal's report. In addition, the co-workers' testimonies suggesting that Shelly had reported Defendant's abusive behavior to them was in rebuttal to evidence presented by Defendant at trial. Furthermore, even without the co-workers' testimonies that Shelly had revealed to them that it was Defendant who had left bruises and marks they observed on Shelly, it would be reasonable for a jury to draw such a conclusion from other evidence, including text messages showing the volatile relationship between Shelly including Defendant's threats to beat her, and Defendant's threat to kill Shelly during a phone call heard by Shelly's workers. Therefore, the trial court's admission of the co-workers' statements is not considered erroneous under La.Code Evid. art. 103(A).

In addition, we conclude that the trial court's admission of the testimonies of Shelly's co-workers as evidence of other crimes, wrongs, or acts under La.Code Evid. article 404(B) was not erroneous. Like the testimonies of Ms. Smith and Ms. Carroll, the testimonies of Shelly's co-workers were also "highly probative to show defendant's identity, pattern, system and motive, and his vicious attitude toward women with whom he shares a close personal relationship." *Rose,* 949 So.2d at 1236.

Therefore, we find that Defendant's second and fourth assignments of error lack merit.

## ASSIGNMENT OF ERROR NUMBER 3

In his third assignment of error, Defendant argues his trial counsel acted ineffectively by failing to request that Shelly's co-workers' hearsay statements be redacted from the fire marshal's investigative report.

> Effective assistance of counsel is guaranteed to criminal Defendants by the U.S. Constitution. *See State v. Bright*, 98-398 (La. 4/11/00), 776 So.2d 1134, *reversed on other grounds*, 02-2793, 03-2796 (La. 5/25/04), 875 So.2d 37.
>
> > To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance."
>
> *Bright*, 776 So.2d at 1157 (citations omitted).

*State v. OBrien*, 17-922, p. 21 (La.App. 3 Cir. 4/4/18), 242 So.3d 1254, 1269.

The supreme court has stated the following concerning the appropriate time to address a claim concerning the ineffective assistance of counsel:

> Ineffective assistance of counsel claims are generally raised in applications for post conviction relief. *See, e.g., State v. Truitt,* 500 So.2d 355, 359 (La.1987). This Court has more often than not declined to consider ineffective assistance of counsel claims on appeal because the record in such cases is usually insufficient to assess such a claim. *Id.; State v. Barnes,* 365 So.2d 1282, 1285 (La.1978). Examining ineffective assistance of counsel claims after a conviction has been affirmed on appeal "enables the district judge in a proper case to order a full evidentiary hearing." *State v. Barnes, supra,* at 1285.

*State v. Peart*, 621 So.2d 780, 787 (La.1993). Similarly, this court has recognized that:

> Decisions relating to investigation, preparation, and strategy require an evidentiary hearing and cannot possibly be reviewed on appeal. Only in an evidentiary hearing in the district court, where the defendant could

present evidence beyond that contained in the instant record, could these allegations be sufficiently investigated. Accordingly, the defendant's claims of ineffective assistance of counsel will be relegated to post-conviction relief.

*State v. Mitchell,* 13-426, pp. 28-29 (La.App. 3 Cir. 11/16/13), 125 So.3d 586, 605, *writ denied*, 14-102 (La. 6/20/14), 141 So.3d 807.

We find that counsel's decision in this case to allow the fire marshal's report to be accepted into evidence without seeking redaction of Shelly's statements made to her co-workers may have been a trial strategy exercised by counsel. Therefore, we relegate this issue to post-conviction relief, where an evidentiary hearing may be held to investigate defense counsel's reasons, if any, for not seeking to redact these statements from the fire marshal's report.

## ASSIGNMENT OF ERROR NUMBER FIVE

In his final assignment of error, Defendant argues that the trial court erred in accepting Deputy State Fire Marshal Chase Hawthorne as an expert in origin and cause of fire and fire investigation.

This court has stated the following regarding the standard of reviewing the trial court's acceptance of expert testimony:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may offer an opinion as to scientific, technical, or other expert testimony if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." La.Code Evid. art. 702. In *State v. Allen,* 41,548, pp. 11–13 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, 1254–55, *writ denied,* 07–530 (La.12/7/07), 969 So.2d 619, the second circuit addressed the admissibility and review of expert testimony, stating:

>> In *State v. Foret,* 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable. *State v. Chauvin,* 02–1188 (La.5/20/03), 846 So.2d 697. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. *Daubert,* 509 U.S. at 592–594, 113 S.Ct. 2786. In *Foret, supra,* the court adopted these observations as a helpful guide for our lower courts in considering this difficult issue. *Id.* Thus, Louisiana has adopted *Daubert*'s requirement that in order for technical or scientific expert testimony to be admissible under La. C.E. Art. 702, the scientific evidence must rise to a threshold level of reliability. . . . The trial court may consider one or more of the four *Daubert* factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. *Id.* Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determinations. *Kumho* [*Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ].

A trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702; *State v. Gipson,* 37,132 (La.App.2d Cir. 6/25/03), 850 So.2d 973, *writ denied,* 03–2238 (La.1/30/04), 865 So.2d 75. The test of competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to demonstrate that a person is an expert. *State v. Gipson, supra*.

*State v. Williams*, 13-497, pp. 13-14 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1245, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

On appeal, Defendant argues that Mr. Hawthorne was improperly accepted as an expert witness in the field of origin and cause of fires and fire investigations. He

notes Mr. Hawthorne's testimony that he did not have a certification as an arson investigator, he was not aware of any minimum training requirements, and he did not provide information concerning his level of involvement in other origin-cause investigations or fatal fires or whether they involved structure fires. Therefore, according to Defendant, Mr. Hawthorne's "knowledge and work experience was insufficient to meet the requisite standard to testify as an expert."

In response, the State notes that Mr. Hawthorne had been a Fire Marshal for over eight years and had served as an arson investigator for the Fire Marshal's office. He had also participated in an 80-hour class at the LSU Fire Emergency Training Institute and National Fire Academy. The State also argues in its brief to this court:

> Mr. Hawthorne testified he investigated one quad and several double fatal fire investigations during his work with the Fire Marshal's office. He described in detail that his role was to investigate to determine the cause and origin of a fire. . . . Mr. Hawthorne testified he had been involved in over 300 cause and origin investigations and fifty fatal fires. . . . This fire was his first fire in which homicide was charged but he testified he had other alleged homicide fires since the Mayeux fire. . . Mr. Hawthorne clearly evidenced his superior knowledge of fire origin and cause in his testimony of the NFPA-1033 and National Fire Code 921. They are the seminal authority codes on fire investigation. . . . Mr. Hawthorne clearly testified that he investigated over fifty fatal fires. Investigations where he would have determined the cause and origin of the fires.

We find that Defendant has failed to show any abuse of discretion in the trial court's acceptance of Mr. Hawthorne's competency to testify at trial as an expert witness under La.Code Evid. art. 702. Mr. Hawthorne testified as to experience and training in origins and cause of fire, fire investigations, as well as arson. While Mr. Hawthorne testified that he did not hold any certifications in fire investigations, Defendant fails to show how Mr. Hawthorne's lack of certification diminishes his competency as an expert in these areas. Defendant also fails to explain how Mr. Hawthorne's minimal homicide experience affected his competency to testify as to

the origins and cause of the fire itself. Additionally, even though there are no minimum requirements for annual continuing education, Mr. Hawthorne testified that he has nonetheless received numerous hours of training in his areas of expertise. Therefore, we find that the trial court did not abuse its discretion in accepting Mr. Hawthorne as an expert in the fields of origin and cause of fire and fire investigation. Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the following reasons, Defendant's conviction and sentence are affirmed, and Defendant's claim of ineffective assistance of counsel is to be relegated to post-conviction relief.

**AFFIRMED.**